# EXHIBIT "A"

Buddy P. Kamakeeaina, Plaintiff Pro Se
2888 Ala Ilima Street, Apt. 1908
Honolulu, Hawaii 96818
Phone: (808) 859-3230
Email: bkamakee@outlook.com

FIRST CIRCUIT COURT
STATE OF HAWAII
FILED

2019 JAN -9  AM 11: 36

N. MIYATA
CLERK

Circuit Court of the First Circuit

of the State of Hawaii

| | |
|---|---|
| Buddy P. Kamakeeaina, | Civil Case No. 19 - 1 - 0 0 3 8 - 01  'JPC |
| Plaintiff Pro Se, | Complaint of Employment |
| vs. | Discrimination; Demand for |
| Armstrong Produce, Ltd., | Jury Trial; Submittal of |
| Defendant. | Exhibit M-2; Declaration. |

## Complaint of Employment Discrimination

My name is Buddy P. Kamakeeaina and I'm a 46-year-old disabled individual suffering

from, but not limited to, Post-Traumatic Stress Disorder (hereinafter "PTSD") and Depression as

diagnosed by multiple licensed healthcare professionals over the past 14 years.  Recently, due to

my age and disability, I believe I was intentionally discriminated against by private employer

Armstrong Produce, Ltd. (hereinafter "Armstrong") during a hiring process on April 5th, 2018.

Prior to my claims against Armstrong as described herein, I had sustained and been

treated for traumatic psychological injuries caused by previous employment-related events that

occurred in late 2016 and early 2017.  After 6 months of intense treatment involving

psychotropic medications and psychotherapy sessions, I find myself in another psychological

I do hereby certify that this is a full, true, and
correct copy of the original on file in this office.

Clerk, Circuit Court, First Circuit

Page 1 of 26

**EXHIBIT "A"**

traumatic employment-related situation.  These traumatic events continue to cause serious

psychological injuries to my mental health due to my position as a victim with PTSD and

Depression while _simultaneously_ in pursuit of antidiscrimination justice as a self-represented

litigant.  As a result, consequential harm from intentional infliction of emotional distress, mental

pain and suffering and financial losses have, and continue to be, reluctantly tolerated.

Nevertheless, the following is a chronological summary of the events that support my

allegations of Armstrong's violations of the "Hawaii Fair Employment Practices Act" (hereinafter

"HFEPA"), Chapter 378 _et seq._ of the Hawaii Revised Statutes (hereinafter "HRS"), as amended;

the "Uniform Controlled Substances Act" (hereinafter "UCSA"), Chapter 329-1 _et seq._, Part IX:

"Medical Use of Marijuana" of the HRS, as amended; Title 12, Chapter 46: Department of Labor

and Industrial Relations; Hawaii Administrative Rules (hereinafter "HAR"); Subchapter no.6 _et_

_seq._: "Age Discrimination" and Subchapter no.9 _et seq._: "Disability Discrimination", as amended;

and Title VII of the "Civil Rights Act of 1964", Pub. L. 88–352, 78 Stat. 241, (hereinafter "CRA"), as

amended: (NOTE: All italicized and underlined words are emphasized)

1.   On **March 20th, 2018,** I completed an Armstrong website PDF-filler application for a

Receiver II/Forklift Operator position as advertised via an online Craigslist job posting.

2.   On **March 21st, 2018,** I signed, dated and submitted said application and my employment

history résumé to Armstrong at 802 Mapunapuna Street, Honolulu, HI 96819.

3.   On **March 23rd, 2018,** I attended my first pre-employment interview with Armstrong

Safety Coordinator, Mr. Derrick Nakamoto.  After discussing with Mr. Nakamoto various

aspects of the job's position and reviewing my submitted résumé, Mr. Nakamoto informed

me of my next upcoming interview with Armstrong's Warehouse Receiving Supervisor, Mr.

Clark Pantil, my potential supervisor should I be hired for said position.  Furthermore, during the waiting period *before* and immediately *after* said interview, I noticed other male applicants whom, at first glance, were *considerably younger* than my 46-year-old age by at least *eight (8) to ten (10) years*.

4.      On **March 26th, 2018**, I attended my second pre-employment interview with Armstrong's Warehouse Receiving Supervisor, Mr. Clark Pantil.  After discussing various job-related duties and relative past skills with Mr. Pantil, Mr. Pantil escorted me throughout the facility to familiarize me with the day-to-day operations as expected of the Receiver II/Forklift Operator.  Again, during the waiting period *before* and immediately *after* said interview, I noticed other male applicants whom, at first glance, were *considerably younger* than my 46-year-old age by at least *eight (8) to ten (10) years*.

5.      On **March 31st, 2018,** after both Mr. Nakamoto's and Mr. Pantil's determination that I was capable of performing, with or without reasonable accommodation, the essential functions of the Receiver II/Forklift Operator position, I received a post-job offer from Armstrong which listed nine (9) *conditional requirements* in order to finalize employment:

1.   My dated signature accepting the post-job offer's conditional requirements;
2.   My *birthdate* for criminal background check purposes;
3.   My *social security number* for criminal background check purposes;
4.   My signature acknowledging the Receiver II job description's requirements;
5.   My signature acknowledging the Work Opportunity Tax Credit (W.O.T.C.) IRS form;
6.   My negative test results for Tuberculosis within the past twelve (12) months;
7.   Two forms of valid identification (e.g., State ID Card, Social Security ID Card, etc.);
8.   My *successfully passing an on-site drug test* at Armstrong's Mapunapuna facility;
9.   My *successfully passing a criminal background* check following the submittal of my *birthdate* and *social security number* (see items no.2 & no.3).

**April 5th, 2018 Post-Job Offer Interview Between Applicant Buddy P. Kamakeeaina and Human Resource Director Marlene L. Mckenzie ("Marlene") of Armstrong Produce, Ltd. at 802 Mapunapuna Street, Honolulu, HI 96819 (Interview Duration: *Approx. 07 min. 11sec.*).**

6.   On **April 5th, 2018** during my third pre-employment interview at Armstrong's

Mapunapuna facility, I submitted to Marlene items no.1 thru no.6 of the post-job offer

*conditional requirements* as listed above.   Moreover, I had attended the interview with

the intention of *completing items no.7 thru no.9* of said requirements .

7.   From the onset of the April 5th interview and as required under the "Certification"

section on page no. 3 of Armstrong's official 5-page application, *I informed Marlene of my*

*registered status* under the State of Hawaii, Department of Health's, Medical Cannabis

Program (hereinafter "DOH/MCP") via the submittal of a *colored-copy* of the approved-

registration certification letter dated 12/01/2017 which also included my medical marijuana

certification card and an informative checklist.

8.   In response, Marlene openly admitted, "I've *never* seen a letter like this!"; she also

admitted, "I've *never* had one come up like this before."; and she also admitted, "I'm going

to have to *do some research*" regarding my DOH/MCP claims.

9.   In response, I gave Marlene verbal permission to *verify my registration status* by

suggesting that she *contact the DOH/MCP* and obtain confirmation via my DOH/MCP

registration number as displayed on the submitted *colored-copy* of my DOH/MCP letter.

10.   I also submitted to Marlene additional DOH/MCP documentation (hereinafter

"informative checklist") included with the DOH/MCP letter informing me of, but not limited

to, State law(s) forbidding public use, including prohibited use of medical marijuana at an

individual's *place of employment*.

11.     In support of the informative checklist, I told Marlene that, in regard to former employers, the issue of medical marijuana *had never been a cause for concern* during previous employment.

12.     In my first attempt to explain to Marlene details of my medical issues, Marlene interrupted me by saying, *"You don't have to disclose any medical information, don't feel like you have to explain."*.

13.     In my second *uneasy* attempt to discuss my medical issues, Marlene emphasized her earlier statements of 'no medical disclosure' by saying, *"No, no, no, don't, please"*. From that moment on, I not only felt *uncomfortable*, but I felt *compelled* to obey Marlene's 'no medical disclosure' statements *out of fear* of having the job offer rescinded.

14.     I informed Marlene of a previous discussion I had with my wife regarding our awareness of the sensitive nature of medical marijuana's acceptance because of Hawaii's *recent passage of its medical marijuana law(s)*; the federal government's *prohibition of* marijuana *prescriptions*; and the *negative social stigma* regarding traditional thinking of marijuana-related issues.  In response, Marlene said she totally understood.

15.     Again, I gave Marlene verbal permission to *verify my registration status* by suggesting that she *contact the DOH/MCP*.  I also informed Marlene that I was *protected under the law* in regard to my physician's *recommendation*.  In response, Marlene inquired by saying, "*Recommendation?*" for which I responded by saying, "Yeah."

16.     After saying to Marlene, "*How am I going to handle this*?", Marlene informed me that, relative to Armstrong's drug policy, "We do have a drug policy and we call it *post-offer*, is *contingent* upon successfully passing this (drug test). *Our policy is based on the federal law*."

17.     In support of Armstrong's federally-enforced drug policy, Marlene offered an example involving *former employees* whom, like me, were in possession of medical marijuana certifications yet after *failing* a required drug test for marijuana, Armstrong deemed the *positive test results* a violation of said drug policy.

18.     Then Marlene  said, "*I'm unsure* whether to tell you that we'll go through the testing." In addition, Marlene also said, "You know, *if it's positive*, unfortunately, *we would have to withdraw the offer*."  At this point, I'm concerned that Marlene *assumes* that I'll either fail the drug test or, if hired, I'd eventually use medical marijuana sometime during my employment at Armstrong.

19.     Again, Marlene said, "Our policy follows the *federal statutes*" and also said, "Every company can make their own policies, some can be more stringent or more lenient *as far as we follow the federal guidelines.*"  Then Marlene said, "Unfortunately, I do know what the State's law is here" and "I do know that *our policies are legal in following the federal* (laws), but I can understand if people who have a State authorization kind of feel like, 'Huh?'".

20.     At this point, I'm confused and feeling discouraged when I say to Marlene, *"What do I do now?!"*.  Nevertheless, and based on Marlene's earlier statement of having to withdraw the post-job offer *if the required drug test is positive*  (see ¶ no.18), I informed Marlene that, "I am prepared to have the offer taken off the table."  Marlene responds by stating, "Oh, I feel, I feel like crap. Sorry."  In response, I said, "I just wanted to be straight-up from the beginning and if I were to get the job, it'll be a way easier transition for everyone involved.".  In response, Marlene says, "Sure, sure. To be upfront and honest."

21.    All of a sudden, and on her own unprovoked volition, Marlene *incorrectly* assumed that

my medical marijuana certification's purpose was to treat "*physical*" pain-relief.  By

comparing me to *former employees*, Marlene said, "The couple situations we've had, I know

how, *I know what a good treatment it is for pain* and that was *our employee who had most*

*recently taking it for real bad* (pain), I don't know if it was *a dislocated shoulder* or

something? And the pain meds were just, *too many side-effects!*".

22.    Although my medical marijuana certification is based on a qualifying disability of a

"*psychological*" disorder of PTSD, *I was afraid* to correct Marlene due to her earlier

statements regarding 'no medical disclosure' (see ¶ no.12 & ¶ no.13).  However, I did offer a

related experience by saying, "In my situation, was *three different types of medications* and

the combination of all three rendered me *incapable* (and) *incompetent*."

23.    Marlene then said, "For that, I feel bad you know. And you know, *kind of scary* now

because *you guys are being good* because *with all the opioid abuse*"; "you don't want to

get...(addicted)"; "my husband was taking some *pain killers* and I was getting *worried about*

*opioid abuse!*"

24.    At this point, I'm confused that Marlene would refer to my medical marijuana

certification as "*you guys are being good*" while simultaneously saying it's "*kind of scary*" and

"*abusive*" in comparison to her husband's addictive use of "*pain killers*" and "*opioid abuse*".

In a related response, I say, "It's addiction, it's addictive either if it's the illegal one or the

legal one."

25.    Then, without warning, Marlene *rescinds* the job offer by saying, "I regret, unfortunately,

that we *cannot* move forward." Contrary to Marlene's earlier statements (see ¶ no.16 & ¶

no.18), Marlene rescinds the job offer *without* administering the required drug test and *without* completing the required criminal background check *as afforded to other applicant(s) and/or former/current employee(s)*. Then Marlene gave me her *Armstrong business card* and said, "I'll give you my card, in case, you know, you have questions later on and you want to contact me."

26. In response to my confusion, Marlene justified her decision to rescind the job offer by telling me about "*a lot of discussions*" that she's had with Armstrong's "*company attorneys*" who confirmed Armstrong's compliance with "*state law in following federal guidelines*". Marlene also admitted to this as being a "*round-about way*" of addressing medical marijuana-related state laws as it relates to Armstrong's federally-enforced drug policy.

27. At this point, I realized Marlene's decision to rescind the job offer is firm and final. As a result, I told Marlene, *"I don't know how to handle this!"* and that I'd look elsewhere for employment. In response, Marlene returns the submitted copy of the DOH/MCP letter to me by saying, "Then you know what, *I going give this back,* because *colored-copies* (see ¶ no.7) cost plenty money!" and she apologizes for Armstrong's drug policy by saying, "I appreciate you being honest and *I'm sorry to tell you what our policies are here*." Confused and frustrated, I ask Marlene, "*So, I'll get a letter in the mail then?*" which I expected would document the outcome of the April 5th interview which, in turn, Marlene confirms by saying, "*Yup*." Marlene then told me, "Thank you for coming in, this is important." At this point, the interview ends as Marlene escorted me to the elevators, down to the first floor and out of the building's front doors leading to the parking lot where I proceeded to leave Armstrong's Mapunapuna facility.

### Conclusive Findings in Support of Discriminatory Claims Against Armstrong

**I.**     **Applicant's Status as a "Qualified" Individual Confirmed Pursuant to the HAR**

After both meetings with Armstrong Safety Coordinator, Derrick Nakamoto and Armstrong Warehouse Receiving Supervisor, Clark Pantil, I was deemed a *qualified* individual for the Receiver II/Forklift Operator position and, as a result, I was offered said position via a post-job offer letter pending the acceptable results of said offer's conditional requirements (see ¶ no.5). Accordingly, pursuant to §12-46-182 "Definitions" of the HAR, the "*essential functions*" and "*qualified*" terms are defined as follows:

- "*Essential functions* means:
(1) The fundamental *job duties* of the employment position the person with a disability holds or desires.
(4) Evidence of whether a particular function is essential should reflect the *actual functioning* and *circumstances* of the particular job. Factors to be considered include, but are not limited to:
(B) Written *job descriptions prepared before* advertising or *interviewing applicants* for the job;"

- "*Qualified* with respect to a person with a disability means a person with a disability who satisfies:
(1) The requisite skill, experience, education, and other job-related qualification standards of the employment position such person holds or desires; and
(2) Who, with or without reasonable accommodation, can perform the essential functions of such position."

Furthermore, and as stated in Armstrong's post-job offer's conditional requirements, I submitted to Marlene the Receiver II/Forklift Operator Job Descriptions notification which I signed and dated acknowledging the receipt of and acceptance of said job descriptions *before* Marlene refused to hire me for said position (see ¶ no.6). Therefore, I reaffirm that I could have performed 100% of the essential functions of Armstrong's Receiver II/Forklift Operator position, with or without reasonable accommodation, just as well as any other non-disabled applicant *should I have been given an equal opportunity to do so*.

## II.     Armstrong's Age Discrimination Violations Relative to the HFEPA & HAR

The April 5th interview began with the submittal of my signed acknowledgment accepting the post-job offer which also included both my required *birthdate* and social security number *as needed by Armstrong* to conduct a standard criminal background check.  However, due to Marlene's immediate retraction of the post-job offer approximately six minutes into the interview, *my birthdate* and social security number *had NOT been used for its intended purpose* of conducting a criminal background check *which Armstrong said it needed it for* (see ¶ no.5).

Furthermore, I had noticed during both of my scheduled appointments with Armstrong Safety Coordinator, Mr. Derrick Nakamoto on March 23rd, 2018 and Armstrong Warehouse Receiving Supervisor, Mr. Clark Pantil on March 26th, 2018 that *all other applicant's applying for the same Receiver II/Forklift Operator* position were at least between *eight (8) and ten (10) years younger* than my 46 years of age (see ¶ no.3 & ¶ no.4).

Therefore, since Marlene had in her possession *my birthdate* since the start of the April 5th interview yet rescinded the post-job offer approximately 6 minutes into said interview *without conducting the criminal background check as proposed*, I am alleging that Marlene's refusal to hire me was because of, but not limited to, my age of 46 years which, in turn, actually resulted in the hiring of a *considerably younger person* for the position of which I was denied in violation of antidiscrimination statutes pursuant to the HFEPA and HAR as described as follows:

- HFEPA: "§378-2 Discriminatory practices made unlawful; offenses defined.
  (a) It shall be an *unlawful* discriminatory practice:

  1. Because of race, sex, including gender identity or expression, sexual orientation, *age*, religion, color, ancestry, disability, marital status, arrest and court record, or domestic or sexual violence victim status if the domestic or sexual violence victim provides notice to the victim's employer of such status or the employer has actual knowledge of such status:

(A) For any employer to *refuse to hire or employ or to bar* or discharge *from employment, or otherwise to discriminate against* any individual in compensation or in the terms,  conditions, or privileges of employment;"

- HAR: "§12-46-131 General policy.
Chapter 378, HRS, *prohibits any employer* or other covered entity *from discriminating in employment because of a person's age*, except where age is a bona fide occupational qualification (BFOQ). [Eff 12/31/90] (Auth: HRS §§368-3,  378-8) (Imp: HRS §§368-3, 378-2, 378-3)."

- HAR: "§12-46-133 Pre-employment practices.
c) Any pre-employment inquiry in connection with prospective employment *which expresses directly or indirectly any* limitation, *specification*, or discrimination *as to age shall be unlawful* unless based on a BFOQ. An applicant *shall not* be:

  (1)  Asked his or her age or *date of birth*;"

- HAR: "§12-46-134 Employee selection.
(a) It is *unlawful* for an employer or other covered entity to *discriminate in employment* by *giving preference because of age*. Thus, if two people of different ages apply for the same position, the employer or other covered entity *may not lawfully turn down either one on the basis of age* but shall make the decision on the basis of some other factor."

III.     **Armstrong's Failure to Reasonably Accommodate Disabled Applicant
         Violates Statutes Relative to the CRA, HFEPA and HAR**

        After the *voluntary release* of my DOH/MCP registration certification letter and *verbal consents* to confirm the validity of said status (see ¶ no.7, ¶ no.9, & ¶ no.15), Marlene *coerced* me into *withholding* any additional medical information after my attempt at trying to discuss my disability-related issues (see ¶ no.12 & ¶ no.13).  As a result, I felt *compelled* to obey Marlene's 'no medical disclosure' statements *out of fear* of having the post-job offer rescinded. Therefore, I allege that Marlene's *coercive intent* was to avoid Armstrong's legal obligation to seek reasonable accommodations for applicants whom are *qualified individuals with disabilities*.

        Furthermore, and as stated on page no.3 of Armstrong's official 5-page employment application, applicant(s) "agree to *fully cooperate and provide* the Company with any additional *consent(s)* and/or *release(s)* as required by the Company *to investigate* employment

applications."  However, my _verbal consents_ to confirm the validity of my registered status, my

_voluntary release_ of multiple DOH/MCP documents and my concerns of the _negative stigma_

surrounding marijuana-related issues to Marlene were _blatantly ignored_ and _returned_ (see ¶

no.7,  ¶ no.9, ¶ no.10, ¶ no.14, ¶ no.15, & ¶ no.27).  After telling Marlene multiple times, "I

don't know how to handle this!" and "What do I do now?", Marlene's _lack of assistance_ and

_failure to retain my medical records_ (see ¶ no.16, ¶ no.20, & ¶ no.27) also supports my claims

against Armstrong regarding the following statutes:

- HFEPA: "§378-2 Discriminatory practices made unlawful; offenses defined.
  (a) It shall be an _unlawful_ discriminatory practice:

     1. _Because of_ race, sex, including gender identity or expression, sexual orientation, age,
     religion, color, ancestry, _disability_, marital status, arrest and court record, or domestic
     or sexual violence victim status if the domestic or sexual violence victim provides notice to
     the victim's employer of such status or the employer has actual knowledge of such status:

     (A) For any employer to _refuse to hire_ or _employ_ or _to bar_ or discharge from employment, or
     otherwise to _discriminate against any individual_ in compensation or in the _terms_, _conditions_,
     or _privileges_ of employment;"

- HAR: "§12-46-181 General provisions.  Chapter 378, HRS, _prohibits_ any employer
  or other covered entity from _discriminating in employment_ against individuals or
  persons _because of a disability_.  Persons with a disability _are entitled_ to equal
  employment opportunities as are available to persons without a disability."

- HAR: "§12-46-182 Definitions. Reasonable accommodation means:
  (1)  In general:
  (A) _Modifications or adjustments_ to a job application process that enable
  an applicant with a disability to be considered for the position such applicant
  desires;
  (B) _Modifications or adjustments_ to the work environment, or to the
  manner or circumstances under which the position held or desired is
  customarily performed, that enable a person with a disability to
  perform the essential functions of that position;
  (C) _Modifications or adjustments_ that enable a covered entity's employee with a
  disability to enjoy the same or equal benefits and privileges of employment as are
  enjoyed by its other similarly situated employees without disabilities; or
  (D) _Modifications or adjustments_ to schedules or leave policies to enable
  an employee with record of an impairment that previously substantially limited, but

no longer substantially limits a major life activity, to attend follow-up or monitoring appointments  from a health care provider.

(2) *Reasonable accommodation may include*, but is not limited to:

(A) Making existing facilities used by employees readily accessible to and usable by   persons with disabilities; and

(B) Job restructuring; part-time or modified work schedules; reassignment to a vacant position; acquisition or modifications of equipment or devices; appropriate adjustment or modifications of examinations, training materials, or policies; the provision of qualified readers or interpreters; *and other similar accommodations for persons with  disabilities*."

- HAR: "§12-46-183 Discrimination prohibited.

   (a) It is *unlawful* for an employer or other covered entity *to discriminate on the basis of disability against a qualified person* in regard to:

   (1) Recruitment, advertising, and job *application procedures*;

   (2) *Hiring*, upgrading, promotion, award of tenure, demotion, transfer, layoff, termination, right of return from layoff, and rehiring;

   (8) Any other *term*, *condition*, or *privilege of employment*, including activities sponsored  by an employer or other covered entity such as social and recreational programs."

- HAR: "§12-46-184 Limiting, segregating, and classifying.

   It is *unlawful* for an employer or other covered entity to *limit*, segregate, or classify *a job applicant* or employee in a way that *adversely affects* his or her *employment opportunities or status* on the basis of *disability*. [Eff 8/18/94] (Auth: HRS §368-3) (Imp: HRS §§378-1,378-2)."

- HAR: "§12-46-187 Failure to make reasonable accommodation.

   (a) It is *unlawful* for an employer or other covered entity *not to make reasonable accommodation to the known physical or mental limitations* of *an applicant* or employee *with a disability who is otherwise qualified*, unless such employer or entity can demonstrate that the accommodation would impose an undue hardship on the operation of its business. An employee *does not have to specifically* request a reasonable accommodation *but must only let the employer know that some adjustment or change is needed* to do a job because of limitations caused by a disability.

   (b) To determine the *appropriate* reasonable accommodation, *it shall be necessary* for an employer or other covered entity *to initiate an interactive process*, after a request for an accommodation, *with the person with a disability* in need of the accommodation. This process shall identify the *precise limitations* resulting from the disability and *potential reasonable accommodations* that could overcome those limitations.

   (c) It is *unlawful* for an employer or other covered entity *to deny employment opportunities to an applicant* or employee *with a disability* based on the *need of such employer or entity to make reasonable accommodation* to such person's physical or mental impairments."

- HAR: "§12-46-189 Retaliation, coercion, interference, or intimidation.
  (c) It is _unlawful to coerce_, intimidate, threaten, harass, or interfere with _any person_ in the exercise or enjoyment of, or because that person aided, counselled, or encouraged any other person in the exercise of, any right granted or protected by this subchapter.

  (d) It is _unlawful_ to aid, abet, incite, or _compel any person_ to engage in any act made unlawful by this subchapter.

  (e) It is _unlawful to attempt_ to engage in _any act_ made unlawful by this subchapter. [Eff 8/18/94] (Auth: HRS §368-3) (Imp: HRS §§378-1, 378-2)."

- HAR: "§12-46-191 Medical examinations and inquiries specifically permitted.
  (f) All information related to or obtained under subsections (b), (c), (d), and (e) regarding the medical examination, _condition_, or _history of any applicant_ or employee _shall be collected_ and _maintained on separate forms_ and _in separate medical files_ and be treated as a confidential medical record, except that:

  (1) _Supervisors and managers_ may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations;

  (2) _First aid and safety personnel_ may be informed, when appropriate, if the disability might require emergency treatment; and

  (3) _Commission employees_ investigating compliance with this subchapter shall be provided any and all information on request."

- HAR: "§12-46-192 Specific activities permitted.
  (b) _Any information_ regarding the _medical condition_ or _history of any_ employee or _applicant_ obtained from a test to determine the illegal use of drugs, except information regarding the illegal use of drugs, _is subject to the requirements of section 12-46-191(f)_."

- Title VII of the Civil Rights Act of 1964; "Effect on State Laws" §2000e-7; §708:

  "_Nothing_ in this subchapter _shall be deemed to exempt or relieve_ any person from any liability, duty, penalty, or punishment provided by any present or future law of any State or political subdivision of a State, other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under this subchapter."

- Title VII of the Civil Rights Act of 1964; "Investigations" §2000e-8; §709:

  "(a) Examination and copying of evidence related to unlawful employment practices: In connection with any investigation of a charge filed under section 2000e-5 of this title [§706], the Commission or its designated representative _shall_ at all reasonable times _have access to_, for the purposes of _examination_, and the _right to copy_ any evidence of any person being investigated or proceeded against that relates to unlawful employment practices covered by this subchapter and is relevant to the charge under investigation."

- Title VII of the Civil Rights Act of 1964; "Investigations" §2000e-8; §709:
  "(c) Execution, retention, and preservation of records; reports to Commission; training program records; appropriate relief from regulation or order for undue hardship; procedure for exemption; judicial action to compel compliance.

  Every employer, employment agency, and labor organization subject to this subchapter *shall* (1) *make* and *keep such records* relevant to the determinations of whether unlawful employment practices have been or are being committed, (2) *preserve such records* for such periods, and (3) *make such reports therefrom* as the Commission shall prescribe by regulation or order, after public hearing, as reasonable, necessary, or appropriate for the enforcement of this subchapter or the regulations or orders thereunder."

**IV.      "Regarded as Having Such an Impairment" by Armstrong Confirms Applicant's Status as a Qualified Individual with Disabilities Pursuant to the HAR**

Marlene's statements and inquiries regarding medical marijuana of either being my

physician's "*Recommendation?*" or a "*good treatment*" for "*real bad*" (pain) due to a former

employee's "*dislocated shoulder?*" and how the former employee's prescription pills had "*too*

*many side-effects!*" violated the HAR's prohibition of pre-employment *medical examinations* or

*inquiries* "as to the *nature or severity* of such disability", albeit Marlene *incorrectly assumed* that

my medical marijuana certification was used to relieve *physical* pain-related ailments (see ¶

no.15, ¶ no.21 & ¶ no.22).

Moreover, Marlene's *biased speculations* and *generalized fears* of drug abuse and/or

drug addiction (see ¶ no.23 & ¶ no.24) contributes to the *negative social stigma* of traditional

antimarijuana-type thinking (see ¶ no.14) while simultaneously, yet prematurely, *classifying* me

as a *drug abuser* and/or *drug addict* in comparison to her husband's addictive use of opioid

drugs for physical pain-relief.

Therefore, not only did Marlene "regarded me as having a *physical* impairment" when

she assumed that my medical marijuana certification had been authorized to treat *physical* pain-

relief, but she also regarded me as an *addictive drug abuser* when she compared me to her

husband's opioid addiction which, in turn, violated the following statutes under the HAR:

- HAR: "§12-46-182 Definitions. As used in this subchapter, unless the context otherwise requires:
  "*Being regarded as having such an impairment*" means is subjected to a *prohibited* action because of any *actual* or *perceived* physical or mental impairment that is both transitory and minor, *whether or not* that impairment substantially limits, *or is perceived* to substantially limit, a major life activity. For purposes of this subchapter, "transitory" is defined as lasting or expected to last six months or less."

- HAR: "§12-46-184 Limiting, segregating, and classifying.
  It is unlawful for an employer or other covered entity to limit, segregate, or *classify a job applicant* or employee in a way that *adversely affects his or her employment opportunities* or *status* on the basis of disability. [Eff. 8/18/94] (Auth: HRS §368-3)
  (Imp: HRS §§378-1,378-2)."

- HAR: "§12-46-190 Prohibited medical examinations and inquiries.
  (a) Except as permitted by section 12-46-191, it is *unlawful* for an employer or other covered entity to:
  (1) Conduct a *medical examination* of an *applicant*; or
  (2) Make *inquiries* as to whether an *applicant is a person with a disability* or as to the *nature* or *severity* of such disability."

## V.   Armstrong's Failure to Establish Current Use of Illegal Drugs Confirms Applicant's Status as a Qualified Individual with Disabilities Pursuant to the HAR

Armstrong's <u>failure to administer</u> the job offer's drug test not only *fails* to prove *current*

*engagement* in the illegal use of drugs, but it also blatantly *denies me equal employment*

*opportunities* as afforded to other disabled/non-disabled applicant(s) and/or former/current

employees (see ¶ no.25). Furthermore, *at no time during the entire April 5th Interview* did I

admit, confess, or make any voluntary comments regarding any current engagement in the

illegal use of drugs. In addition, *at no time during the entire April 5th Interview* did Marlene

inquire into the frequency, duration, or most recent or actual use of medical marijuana. Any

medical marijuana statements made on my behalf referred *only* to the following:

1. DOH/MCP documents dated 12/01/2017 of my registered status, official certification card, and informative checklist (see ¶ no.7);

2. Prior discussion with my wife regarding historically-biased, negative stigma-type thinking of marijuana prohibition (see ¶ no.14);

3. Hawaii's passage of medical marijuana state laws vs. federal laws prohibiting marijuana prescriptions (see ¶ no.14);

4. My physician's recommendation of the medical benefits of medical marijuana (see ¶ no.15);

5. Vague description of adverse side-effects of previously prescribed medications (see ¶ no.22).

Collectively, items no.1 thru no.5 *do NOT confirm nor are they evidence of* the current engagement in the illegal use of drugs.  Furthermore, the DOH/MCP *does NOT manufacture, distribute, sell, prescribe, dispense, nor treat patients with medical marijuana*.  One of the DOH/MCP's responsibilities is to legitimately certify a patient's physician-recommended use of medical marijuana based upon the patient's *qualifying disability*.  Accordingly, the DOH/MCP approved my registered status because of my *qualifying disability of PTSD*.

Moreover, although my physician may have *recommended* medical marijuana to treat the symptoms of my PTSD, I am NOT bound by this recommendation.  Medical marijuana is an *alternative option* to PTSD treatment, as are other available treatment options for mentally impaired individuals.

Furthermore, Marlene's various *assumptions* that, like her husband, I'd become an *addictive drug abuser* or that my medical marijuana certification had been authorized for *physical* pain-relief (see ¶ IV) are *biased, unwarranted, inappropriate* and *incorrect*.  While simultaneously comparing me to former medical marijuana certified employees whom, *unlike me*, had failed required drug tests for marijuana (see ¶ no.17 & ¶ no.18), Marlene also *assumed* that I would have failed the post-job offer's required drug test *based on my submitted DOH/MCP documents*.

Therefore, by *failing to adequately administer* the required drug test due to Marlene's aforementioned assumptions, Armstrong *erroneously* regarded me as currently engaging in the illegal use of drugs, when in fact, *there exists NO evidence of any current engagement in the use of any illegal or legal drugs* which, in turn, violates the following statutes under the HAR:

- HAR: "§12-46-188 Qualification standards, tests, and other selection criteria.

  (f) It is *unlawful* for an employer or other covered entity *to fail to* select or *administer tests* concerning employment in the most *effective* manner to *ensure* that, *when a test is administered to a job applicant* or employee *who has a disability* that *impairs sensory, manual, or speaking skills*, the test results *accurately reflect the* skills, aptitude, or *whatever other factor of the applicant* or employee *that the test purports to measure*, rather than reflecting the impaired sensory, manual, or speaking skills of such employee or applicant (except where such skills are the factors that the test purports to measure). [Eff. 8/18/94] (Auth: HRS §368-3) (Imp: HRS §§378-1, 378-2)."

- HAR: "§12-46-182 Definitions.  As used in this subchapter, unless the context otherwise requires:

  Drug use shall be considered a *mental* or *physical impairment* when a person:
  (D) Is *erroneously regarded as engaging in such use* but is not engaging in such use."

## VI.    Drug-Free Workplace Act of 1988 (DFWA) Inappropriately Applied to Applicant

To justify her claims of Armstrong's drug policy's compliance to "federal law, statutes, guidelines" (see ¶ no.16, ¶ no.17, ¶ no.19 & ¶ no.26), Marlene had referred to a federal statute called the "Drug-Free Workplace Act of 1988" (hereinafter "DFWA") which is the foundation of Armstrong's drug policy due to Armstrong's business transactions with the federal government which, in turn, obligates Armstrong's compliance under §701 *et seq.* of the DFWA as follows:

- §701(a)(1)(A): "Publishing a statement notifying *employees* that the *unlawful* manufacture, distribution, dispensation, possession, or use of a controlled substance *is prohibited in the person's workplace*…"
- §701(a)(2): "…*the individual will not engage* in the *unlawful* manufacture, distribution, dispensation, possession, or use of a controlled substance *in the performance of the contract*…"
- §702(a)(1)(A): "Publishing a statement notifying *employees* that the *unlawful* manufacture, distribution, dispensation, possession, or use of a controlled substance *is prohibited in the grantee's workplace*…"

- §702(a)(2): "...*the individual will not engage* in the *unlawful* manufacture, distribution, dispensation, possession, or use of a controlled substance *in conducting any activity with such grant*..."
- §706(1): "...which *employees* of such entity are prohibited from engaging in the *unlawful* manufacture, distribution, dispensation, possession, or use of a controlled substance *in accordance with the requirements of this Act*..."
- §706(3): "...the term ''controlled substance'' means a controlled substance in *schedules I through V of section 812 of title 21*..."

Apparently, the DFWA *only applies to hired employee(s)* and/or *their contracted employer(s)* whom are at the *workplace* and *NOT pre-employment applicants*. Therefore, Armstrong's DFWA-enforced drug policy was *falsely, blatantly* and *intentionally* used by Marlene to *deny me equal employment opportunities afforded to other applicants and/or former/current employees* because of, but not limited to, *my DOH/MCP medical marijuana certification* which Marlene *regarded as a violation* of said drug policy. As a result, Marlene's actions violated the HAR as described as follows:

- HAR: "§12-46-188 Qualification standards, tests, and other selection criteria.
- (a) It is *unlawful* for an employer or other covered entity to use *qualification standards*, *employment tests*, or *other selection criteria* that *screen out* or *tend to screen out a person with a disability* or a *class of persons with disabilities* unless the employer or other covered entity justifies the need for the standard, test, or selection criterion.

- (b) Standards, tests, or selection criteria that *screen out a person with a disability* or a *class of persons with disabilities* based upon specified *physical* and *mental impairments*, *medical conditions*, or *disabilities* must be shown to be *bona fide occupational qualifications*.

- (c) Other standards, tests, or selection criteria *not based upon specified physical* or *mental impairments*, *medical conditions*, or *disabilities*, that *screen out a person with a disability* or a *class of persons with disabilities* must be shown to be *job-related* for the position in question and consistent with *business necessity*."

**VII.    Armstrong's Violations of the CRA and the Rehabilitation Act of 1973**

As described herein, Armstrong's alleged discriminatory acts in turn violated the following statutes pursuant to the CRA and Rehabilitation Act of 1973 as described as follows:

- §793(a) - Employment Under Federal Contracts: "Any contract in excess of $10,000 entered into by any Federal department or agency for the procurement of personal property and nonpersonal services (including construction) for the United States shall contain a provision requiring that the party contracting with the United States *shall take affirmative action to employ and advance in employment qualified individuals with disabilities*. The provisions of this section shall apply to any subcontract in excess of $10,000 entered into by a prime contractor in carrying out any contract for the procurement of personal property and nonpersonal services (including construction) for the United States. The President shall implement the provisions of this section by promulgating regulations within ninety days after September 26, 1973."

- §794 - Nondiscrimination under Federal Grants and Programs: "No otherwise *qualified individual with a disability* in the United States, as defined in section 705(20) of this title, *shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination* under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service..."

## VIII.     Written Certification of PTSD Confirms Armstrong's Violations of HFEPA & HAR

According to HRS Chapter 329 of the UCSA, the DOH/MCP letter that I submitted to

Marlene notifying her of my registration certification had been approved by the DOH/MCP

based on the following two (2) conditions:

➢ Condition no. 1: The "*qualified patient*" shall be diagnosed by a licensed healthcare professional

as having a "*debilitating medical condition*" as described as follows:

- "§329-121 *Debilitating medical condition* means:
(1) Cancer, glaucoma, lupus, epilepsy, multiple sclerosis, rheumatoid arthritis, positive status for human immunodeficiency virus, acquired immune deficiency syndrome, or the treatment of these conditions;

(2) A chronic or debilitating disease or medical condition or its treatment that produces one or more of the following:
   (A) Cachexia or wasting syndrome;
   (B) Severe pain;
   (C) Severe nausea;
   (D) Seizures, including those characteristic of epilepsy;
   (E) Severe and persistent muscle spasms, including those characteristic of multiple sclerosis or Crohn's disease; or
   (F) *Post-traumatic stress disorder*; or

(3) Any other medical condition approved by the department of health pursuant to administrative rules in response to a request from a physician or advanced practice registered nurse or potentially qualifying patient.

• _Qualifying patient_ means a person who has been diagnosed by a physician or advanced practice registered nurse as having a _debilitating medical condition_."

➢ Condition no. 2: The qualifying patient's physician or Advanced Practice Registered Nurse

(APRN) submits a "_Written Certification_" to the DOH/MCP _recommending_, in their

_professional opinion_, the qualified patient's beneficial medical use of marijuana as follows:

• "§392-121: _Written certification_ means the qualifying patient's medical records or a statement signed by a qualifying patient's physician or advanced practice registered nurse, stating that in the physician's or advanced practice registered nurse's _professional opinion_, the _qualifying patient_ has a _debilitating medical condition_ and the potential benefits of the medical use of cannabis would likely outweigh the health risks for the qualifying patient."

• "§329-122: Medical use of cannabis; conditions of use.
   (a) Notwithstanding any law to the contrary, the medical use of cannabis by a qualifying patient shall be permitted only if:
   (1) The _qualifying patient_ has been diagnosed by a physician or advanced practice registered nurse as having a _debilitating medical condition_;
   (2) The qualifying patient's physician or advanced practice registered nurse has _certified in writing_ that, in the physician's or advanced practice registered nurse's _professional opinion_, the potential benefits of the medical use of cannabis would likely outweigh the health risks for the particular qualifying patient;"

Furthermore, pursuant to HRS Chapter 329 of the UCSA, the DOH/MCP _shall issue a_

_registration certificate_ to the qualified patient as described as follows:

• "§329-123: Registration requirements; qualifying patients; primary caregivers.
   (a) Physicians or advanced practice registered nurses who issue written certifications _shall provide_, in each _written certification_, _the name_, _address_, _patient identification number_, and _other identifying information_ of the qualifying patient.

   (b) Qualifying patients _shall register_ with the department of health. The registration shall be effective until the expiration of the certificate issued by the department of health and _signed_ by the physician or advanced practice registered nurse…The department of health _shall issue_ to the qualifying patient a _registration certificate_ and shall charge $35 per year."

Therefore, I allege that the *colored-copy* of my DOH/MCP registration certificate submitted to Marlene (see ¶ no.7) had been, but not limited to, Marlene's reasoning for her decision to *refuse to hire* me, regardless of my DOH/MCP registration certifying my *PTSD* or my being *deemed qualified to perform*, with or without reasonable accommodations, the *essential functions* and *duties* of the Forklift Operator/Receiver II position by Armstrong employees' Mr. Nakamoto and Mr. Pantil (see ¶ no.5) thereby violating the following statutes:

- HFEPA: "§378-2 Discriminatory practices made unlawful; offenses defined.
(a) It shall be an *unlawful* discriminatory practice:

  1. *Because of* race, sex, including gender identity or expression, sexual orientation, age, religion, color, ancestry, *disability*, marital status, arrest and court record, or domestic or sexual violence victim status if the domestic or sexual violence victim provides notice to the victim's employer of such status or the employer has actual knowledge of such status:

  (A) For any employer to *refuse to hire* or *employ* or *to bar* or discharge from employment, or otherwise to *discriminate against any individual* in compensation or in the *terms, conditions*, or *privileges* of employment;"

- HAR: "§12-46-181 General provisions. Chapter 378, HRS, *prohibits* any employer or other covered entity from *discriminating in employment* against individuals or persons *because of a disability*. Persons with a disability *are entitled* to equal employment opportunities as are available to persons without a disability."

In summary, my DOH/MCP registered certificate was issued to me because of my diagnosed mental impairment of *PTSD* and my physician's *recommendation* of the beneficial use of medical marijuana. Therefore, for Marlene to refuse to hire me because of my *age* of 46 years, her *generalized fears of drug abuse/drug addiction* and my approved *registered certification* as a mentally impaired person with *PTSD* is, at the very least, a callous, deliberate and demeaning act initiated upon her receipt of, and including leading up to, her calculated *illegal* return of said certificate (see ¶ no.27).

**IX.      Harm Caused by Armstrong's Discriminatory Acts & Relief Sought**

Immediately following the retraction of Armstrong's post-job offer, I became increasingly

depressed each passing day and each and every time I saw an employment ad requiring both a

drug test and criminal background check.  As time went on, and whilst still seeking employment,

my depressive disorder and PTSD worsened which resulted in my complete isolation from

society without any hope of being employed. In an attempt to make sense of my unfortunate

situation, I began to investigate Armstrong's claims of compliance--albeit in a "*round-about*

*way*"--to both state and federal law in regard to Armstrong's DFWA drug policy and its hiring

practices.

However, although I had acquired throughout this 9 month long investigative endeavor

clear and accurate evidence of multiple discriminatory acts committed by Armstrong as

described herein, doing so has had its share of consequences.  For example, as a disabled

individual who suffers from PTSD and depression, the resulting adverse symptoms caused by

Armstrong's discriminatory treatment has intensified due to my persistent pursuit of

investigative and legal efforts to defend myself throughout this litigation process.

Throughout the past 9 months, I've been having daily problems with either sleeping,

eating, concentrating, thinking, working and/or mood swings thereby causing my psychological

state-of-mind, my social affairs and financial situation to worsen.

In retrospect, I did not deserve to be treated in such a blatant, callous and demeaning

way by an administrative-level Human Resource Director whom, as the title portrays, should be

more of a positive facilitator who directs their professional conduct in a more humane way

towards all applicants and employees with or without disability-related concerns. Therefore, as a

direct result of Armstrong's alleged discriminatory acts as described herein, Armstrong is liable

for the intentional infliction of emotional distress, mental pain and suffering, compensatory

damages, loss of wages, attorney fees and punitive damages for which *I seek the monetary relief*

*of $450,000* from Armstrong for said damages.

## X. Notice of Right to Sue Confirmed, Demand for Jury Trial, & Official Word Count

- Pursuant to HAR §12-46-11, the Hawaii Civil Rights Commission (hereinafter "HCRC") has

issued me a formal "Notice of Dismissal and Right to Sue" letter signed and dated on 10/11/2018

and received on 10/12/2018 allowing me to file an employment discrimination lawsuit against

Armstrong in the First Circuit Court of the State of Hawaii within (90) ninety-days from date of

receipt of said notice (see attached Exhibit M-2).

- Plaintiff hereby demands a jury trial in this matter as afforded under the laws of the State

of Hawaii and the United States of America.

- This complaint's official word count is: 8,185.

## XI. Conclusion & Declaration

From the onset of the April 5th interview, and after submitting both my *birthdate* and a

*colored-copy* of my DOH/MCP confidential medical documents, Marlene went from admitting

she never before saw said documents, to never encountering an incident like this before (i.e.,

46-year old, disabled applicant submitting confidential medical documents from the DOH/MCP),

to admitting that, in accordance to applicable federal law, successfully passing the drug test is

*contingent* upon the post-job offer's requirements and Armstrong's DFWA-enforced drug policy.

In addition, Marlene offered past examples involving former employees whom, like me,

possessed a medical marijuana certification yet, *unlike me*, failed an employer-required drug test

for illegal drugs thereby violating Armstrong's DFWA drug policy.  Then Marlene said, "You

know, *if it's positive*, unfortunately, *we would have to withdraw the offer*."  However, Marlene

*failed to administer* Armstrong's job-offer drug test *before* rescinding the job-offer.

In comparison to other disabled people, Marlene "regarded me as having a *physical*

*impairment*" when she inquired into the *nature and severity of my disability* as she *incorrectly*

*perceived it* thereby prompting her belief that my medical marijuana certification was authorized

to treat *physical pain*-related ailments when, in fact, my certification is recommended to treat

symptoms of PTSD, a *psychological* disorder.  Again, and in comparison to her husband's use of

*highly-addictive pain-relieving opiate drugs*, Marlene "regarded me as an *addictive drug abuser*"

when she inquired into the *nature and severity of my disability* as she *incorrectly perceived it*

thereby prompting her belief that, like opiate drug addicts, the outcome of using medical

marijuana shares the same ominous faith.

Then, *without* warning, Marlene *rescinds* the job-offer based on *numerous discussions*

*she's had with Armstrong attorneys* confirming Armstrong's compliance to State & Federal laws

based on my submitted *confidential DOH/MCP medical documents*—the same documents she

admitted *never* seeing before.  Apparently, and in lieu of an official drug test, the mere fact that I

possess a medical marijuana certification violates Armstrong's DFWA drug policy which,

according to Marlene, is based on federal law.  *This makes no sense*. Federal law prohibits the

*use* of illegal drugs pursuant to the Controlled Substance Act and *NOT the possession of various*

*medical marijuana certification documents*.  As described herein, *at no time during the entire*

*April 5th interview* did I admit, confess, or make any voluntary comments regarding any current

engagement in the illegal use of drugs.  In addition, *at no time during the entire April 5th*

*interview* did Marlene inquire into the frequency, duration, or most recent or actual use of medical marijuana.

Furthermore, Marlene knew of her *legal obligation to retain confidential medical information* revealed to her during the hiring process yet, on her own volition, intentionally returned *the colored-copy* of my confidential medical documents to me *after* rescinding the job-offer in violation of the HAR and CRA as described herein.  In addition, Marlene intentionally *coerced* me to withhold any additional medical information to avoid *Armstrong's legal obligation to attempt to reasonably accommodate qualified individuals with disability(s)* pursuant to the HFEPA and HAR.

According to Marlene, and in lieu of an official drug test, possession of said certification nullifies Armstrong's legal obligation to make reasonable accommodations for qualified disabled applicants, validates Armstrong's adverse actions contrary to Armstrong's post-job offer conditional requirements and justifies her refusal to hire me for the said position *without evidence of current engagement in the illegal use of drugs*.

### Declaration

I declare, under penalty of perjury, that the foregoing is true and correct under the laws of the State of Hawaii and the United States of America.

Signature: _____     Date: <u>January 8th, 2019</u>

               Buddy P. Kamakeeaina, Plaintiff Pro Se

//
//
//
//
//
//
//////////////////////////////////////////////////////////////////////////////////////

| **STATE OF HAWAI'I**<br>CIRCUIT COURT<br>OF THE FIRST CIRCUIT | **SUMMONS**<br>TO ANSWER CIVIL COMPLAINT | CASE NUMBER<br>CIVIL NO. _19 - 1 - 0 0 3 8 - 0 1_ |
|---|---|---|

| PLAINTIFF,                          VS. | DEFENDANT. |
|---|---|
| Buddy P. Kamakeeaina | Armstrong Produce, Ltd. |

| PLAINTIFF'S ADDRESS (NAME, ADDRESS, TEL. NO.)<br><br>Buddy P. Kamakeeaina, Plaintiff Pro Se<br>2888 Ala Ilima Street, Apt. 1908<br>Honolulu, Hawaii 96818<br>Phone: (808) 859-3230<br>Email: bkamakee@outlook.com | I do hereby certify that this is a full, true, and correct copy of the original on file in this office.<br><br>Clerk, Circuit Court, First Circuit |
|---|---|

### TO THE ABOVE-NAMED DEFENDANT(S)

You are hereby summoned and required to file with the court and serve upon

Buddy P. Kamakeeaina, Plaintiff Pro Se
_____ ,
plaintiff's attorney, whose address is stated above, an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the date of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**THIS SUMMONS SHALL NOT BE PERSONALLY DELIVERED BETWEEN 10:00 P.M. AND 6:00 A.M. ON PREMISES NOT OPEN TO THE GENERAL PUBLIC, UNLESS A JUDGE OF THE ABOVE-ENTITLED COURT PERMITS, IN WRITING ON THIS SUMMONS, PERSONAL DELIVERY DURING THOSE HOURS.**

**A FAILURE TO OBEY THIS SUMMONS MAY RESULT IN AN ENTRY OF DEFAULT AND DEFAULT JUDGMENT AGAINST THE DISOBEYING PERSON OR PARTY.**

| DATE ISSUED<br>JAN 0 9 2019 | CLERK<br>N. MIYATA | FIRST CIRCUIT COURT<br>SEAL<br>STATE OF HAWAII | N. MIYATA<br>CLERK | FIRST CIRCUIT COURT<br>STATE OF HAWAII<br>FILED |
|---|---|---|---|---|
| I do hereby certify that this is full, true, and correct copy of the original on file in this office | | Circuit Court Clerk | | |

In accordance with the Americans with Disabilities Act and other applicable state and federal laws, if you require a reasonable accommodation for a disability, please contact the ADA Coordinator at the First Circuit Court Administration Office at PHONE NO. 539-4333, FAX 539-4322, or TTY 539-4853, at least ten (10) working days prior to your hearing or appointment date.

Reprographics (07/11)  RevaComm 508 Certified                                      SUMMONS TO ANSWER CIVIL COMPLAINT 1C-P-787